T. & W. MILLER *v.* HENRY G. LAPHAM, WELLINGTON KETCHAM, AND JOHN J. WILLIAMS.

[S. C. 44 Vt. 416.]

*Water Privilege. Mills and Mill Owners. Practice.*

A mill owner who has a restricted right to the use of the water of a stream as against other mill owners on the same stream, is not bound to take and use the water as it was taken and used at the time the right was created; but he may take and use it in any reasonable manner that will not be worse for such other owners, than it would be if taken and used as formerly. And if in so doing, he destroy the measure and gauge of his restrictive right, such other owners do not thereby lose their rights; but he must establish his right by such evidence as he can obtain, and is situated as he would be if the means of measuring his right were destroyed by time or floods.

It was *held* that the evidence in this case, *q. v.*, *tended* to show that R., the lessee of the defendants' grist-mill, wrongfully used the water of a stream to the injury of the paramount right of the plaintiffs' paper-mill, with the authority of the defendants, and that the question of such authority was, therefore, properly submitted to the jury.

CASE, for the diversion of water from the plaintiffs' paper-mill. Plea, the general issue, and trial by jury, September term, 1873, WHEELER, J., presiding.

It appeared that the plaintiffs' paper-mill was situate in Fairhaven, on the south side of Castleton River, and that on the north side of said river were a grist-mill and a saw-mill ; that the water to supply these several mills, was taken from a common dam across the river—the water for the paper-mill being conducted to it by means of a flume of its own, connecting with the south end of the dam, and the water for the grist-mill being conducted to it by means of a flume of its own, connecting with the north end of the dam, and that such had been the respective arrangements ever since the earliest recollection of any witness, extending back for more than fifty years.

The plaintiffs' evidence tended to show that on the 29th of July, 1867, the defendants were the owners of the grist-mill and privilege, and that they then erected a slate-mill for the sawing and manufacture of slate, having one wheel for its use, and took the water for such wheel from the grist-mill flume, and run such slate-mill by itself, and sometimes while the grist-mill was running, or a part of the wheels thereof, more or less, from the first day of August, 1867, to the commencement of this suit, January 13th, 1868 ; and it was for such use of the water by the defendants during this period, causing, as the plaintiffs claimed, a diversion from the paper-mill of the water belonging to it and necessary for its use, that the plaintiffs claimed to recover. The plaintiffs did not claim to recover for any use of the water by the defendants, except in low water, when the water of the river did not run over the dam ; nor for such use, at any time when the motion of the paper-mill wheel was not impeded thereby.

Matthew Lyon was originally the owner of the lands on both sides of said river at this point, and of the bed of the stream, and the entire water privilege ; and he originally built the paper-mill, the grist-mill, and the saw-mill.

A deed from Matthew Lyon to Smith and Huffman, dated July 20, 1795, of the grist-mill and saw-mill, was introduced in evidence ; also, sundry other deeds, the last dated August 6, 1796,

conveying back to Lyon the grist-mill and saw-mill; also, the deed of Matthew Lyon to Solomon Cleveland, dated August 17, 1796, of one half of the grist-mill and saw-mill; the deed of Matthew Lyon to Nathaniel Dickinson, dated September 26, 1799, of the other half of the grist-mill and saw-mill; sundry deeds bringing the title of the grist-mill and the saw-mill to. Salmon Norton, April 8, 1804; Salmon Norton's deed to Josiah Quinton, dated November 10, 1807, of the grist-mill; and sundry deeds bringing the title of the grist-mill to the defendants, April 10, 1867; also, Matthew Lyon's deed to Josiah Norton, of the paper-mill, dated September, 25, 1799; deed, Salmon Norton, son and heir of Josiah Norton, to Alexander Donahue, dated July 30th, 1804, of the paper-mill, " with all the privileges and appurtenances thereunto belonging, with all the rights and privileges on the falls where the paper-mill stands, reserving to myself the grist and saw-mill thereon standing, with all the privileges thereunto belonging;" and sundry deeds conveying such title of Donahue down to the plaintiffs. These several deeds are referred to and construed in the report of this case in 44 Vt. 416, *q. v.*

March 29, 1838, Sproat & Safford, who then owned the paper-mill and right in the plaintiffs' chain of title, conveyed by deed to H. & H. Howard, " the right and privilege of drawing water from the paper-mill dam, sufficient to carry a bark-mill which may be erected by said H. & H. Howard, whenever the water of said dam shall be running to waste over the said dam; and whenever by so doing, they, the said H. & H. Howard, shall not in anywise injure or affect the operation of the paper-mill, grist-mill, or saw-mill now standing on the falls." This title passed to the defendants by the deeds of the grist-mill right.

The plaintiff gave further evidence tending to prove that in 1859, Howard, the owner of the grist-mill deepened that part of the channel in the pond leading to his flume, by blasting out rocks, by means of which more of the water was conducted to the grist-mill, and away from the paper-mill, than had ever before been accustomed to flow to the grist mill, whereby the channel was much changed, so that thereafter the grist-mill could draw the water, and run as long as the paper-mill could run to advantage;

while previously, the channel had been such that the paper-mill could draw the water away from the grist mill; that Howard at the same time took out one large tub wheel carrying the grist-mill, and substituted therefor four iron wheels, called Tyler wheels, which required and used much more water for the running of the grist-mill, than had before been required or used, and that these same arrangements were in use during the time of the injury complained of; that during that time, the water of the stream was very low, and that the defendants ran their slate-mill both night and day, and that the grist-mill was run during the day time, and sometimes during the night, sometimes a part only, and at other times all the wheels of the grist-mill, while the slate-mill was also running, and that during that time the grist-mill and slate-mill used much more water than the paper-mill did, the full discharge of the paper-mill wheels being 1,799 feet, of the grist-mill wheels 3,240 feet, and of the slate-mill, 900 feet; that the plaintiffs' had help and material, except straw, and that farmers about there had straw that they could have bought, with which they could have made paper if they could have had water, and during all this time were running, and attempting to run, both night and day, their paper-mill in the manufacture of paper, but that they were often obliged to stop their works from time to time, at all hours of the day, amounting in the whole to from one quarter to one half the time, for want of water to run them; and that for like reason, the motion of their mill when running, was slow, irregular, and interrupted, all occasioned by such excessive use of the water by the grist-mill and the slate-mill, and that, as a consequence, they sustained great damage in the loss of profits of the paper which they would otherwise have made, and in the quality of that which they did make, and in delay in getting the same to market.

The defendants' evidence tended to prove that the work so done by Howard in 1859, did not have the effect to draw the water of the stream away from the paper-mill, and that the four wheels put in by him, required and used less water than had been before required and used; that the slate-mill was not used at any time when all the wheels of the grist-mill were running, but that

whenever the slate-mill was running, the water was shut off from the grist-mill wheels, to an amount fully equivalent to the amount used by the slate-mill wheel; and that from 12 o'clock at noon to 12 o'clock at night, the slate-mill or the grist-mill did not run, nor was any water used, unless the water of the stream was then running over the dam. The defendants' evidence, uncontradicted in this respect, further tended to show, that on the 10th of October, 1863, the title to the grist-mill and its privileges, and bark-mill privilege, became vested in the defendant Ketcham and one Capen; that previous to the purchase of any interest therein by the defendants Williams and Lapham, Capen leased his share of the grist-mill to one Reed, to run until April 1st, 1868; that after Williams and Lapham purchased their interest, Reed continued in occupation of the grist-mill, and rented the rest of it of the defendants, under provisions in regard to water, that while the defendants were running the slate-mill wheel at any time, Reed should shut down one of the grist-mill wheels, and that at no time should Reed use the full power of the grist-mill when the slate-mill was running, unless the water was running over the dam; that these provisions were made by the defendants in renting the grist-mill to Reed, and that they charged him less rent for the grist-mill, on account of running the slate-mill wheel under the grist-mill privilege. It appeared that Reed paid the rent of the grist-mill to the defendants, for the time that he occupied under them, and that this rent for the year, covering the period of time complained of in this suit, was nine hundred dollars, and that the defendants deducted twenty-five dollars from his rent, on account of his shutting down the grist-mill wheels for the slate-mill to run. The testimony tending to show this, was given by the defendant Williams in a deposition; and in it he further testified, that they claimed that they had a right of the water from 12 o'clock at night to 12 o'clock at noon, and so used it, but used less than half gate in running their slate-mill; that the deceased plaintiff, William Miller, came to him and told him that the defendants had no right to run the slate-mill wheel under the tannery privilege, and that he replied, that to avoid any trouble or any law-suit in the matter, they had made provisions to run under the

68

grist-mill privilege. The plaintiffs' testimony tended to show, that at the time when the defendants were claiming the right to run from midnight to noon, the plaintiffs claimed the right to the water at all hours of the day. The defendants' evidence tended to show that the slate-mill when running alone, took much less water than the grist-mill right, and that whenever the slate-mill was running at the same time with the grist-mill, the water was shut off from part of the wheels of the grist-mill, to an amount fully equal to the amount used by the slate-mill, according to the arrangement between the defendants and said Reed, as stated, and that the amount used in such case by both mills, was within said grist-mill right, and did not injure the motion of said paper-mill from noon to midnight, and that the amount of water so used, was at no time in excess of said grist-mill right. The defendants' evidence further tended to show, that during a part of the time named in the plaintiffs' declaration, during which they claimed damages, the slate-mill was not running, but the grist-mill was running. The plaintiffs further introduced evidence tending to contradict the times, manner, and extent to which said mills were run, and the amount of water used, and the effect of such use on the plaintiffs' mill ; and tending to prove that no such agreement as claimed by the defendants between them and Reed, relative to the partial stopping of the grist-mill, was observed in the running of the mills, but that the slate-mill and grist-mill were both running together a large share of the time, by day and by night, indiscriminately, and the use of the paper-mill thereby greatly impeded, and often entirely stopped, during the period covered by the declaration, and that the defendants fully understood the manner of Reed's running. There was no evidence that they in any way ever objected thereto.

There was no evidence of any authority given to Reed to use any more water in the running of the grist-mill, than the proper right belonging to it, except such, if any, as arises upon the facts and evidence as stated.

In the opening of the case, the plaintiff, T. Miller, introduced himself as a witness, and after he had testified fully as to how the paper-mill had been affected by the running of the grist-mill and

the slate-mill, was inquired of on cross-examination, for what he claimed damages, and answered, that he thought the grist-mill had trespassed upon him when it started up, but he had not sued for that; that it was for the use of the water by the slate-mill wheel that he claimed damages, and that he claimed no damages for the use by the grist-mill. It appeared that the claim sought to be enforced in this action, had been assigned for the benefit of the creditors of the plaintiffs, and that this suit was being prosecuted by the assignee, and full damages were claimed for the whole injury, upon all the evidence in the case. The defendants' evidence, uncontradicted in this respect, tended to show that as far back as any living memory, the water for carrying the paper-mill was taken out down at the bottom of the pond, into a flume set into the dam, and passed from the bottom of the flume upon a tub wheel or wheels which were set about 15 feet below the top of the dam; that these wheels were afterwards changed for iron turbine wheels, called Tyler wheels, receiving the water at the same level, one of which remained there and carried the paper-machine during the time named in the declaration; that additional engines and other machinery had been added to the paper-mill by the plaintiffs, before the injuries complained of, requiring an increase of from 23 to 46 horse power to carry the mill; that they had before the injuries complained of, substituted for all the former Tyler wheels, except the one for carrying the paper-machine, what is called a wooden pitch-back wheel, which was elevated from the former level so as to take the water by a gate one foot below the top of the dam, and to strike the buckets of the wheel at "10 o'clock." Also, that the wheels of the grist-mill and of the slate-mill, took the water from the bottom of their flume, at about 14 feet below the top of the dam, which was level along the top, but that the head was somewhat less than that of the former paper-mill wheels, so that by draining the pond, the water would flow into the paper-mill flume after it ceased to flow into the grist-mill flume; that the depth of water in the pond in front of the paper-mill flume, and where it entered that flume, was five feet and eight inches from the top of the dam, and that the depth of water in the pond in front of the grist-mill flume, and where it

entered that flume, was four feet and one inch from the top of the dam. Also, that said pitch-back wheel required more water to carry the paper-mill, than the former wheels required. These last statements were contradicted by the plaintiffs' evidence, as stated below.

The plaintiffs' evidence tended to show that the pitch-back wheel was an advantageous one to use for the purposes of the paper-mill, with the water-power at that place ; that it was economical of water, and required much less· water to carry the paper-mill than the former wheels that had been in use for that purpose ; that it was a good wheel to use when there was but little water in the stream, because it would save water ; that it drew water at about eighteen inches head, with a full pond, and could not be run without a pond full up to within about that distance below the top of the dam, and could not be used with success against the wheels that drew the water at so much lower level on the grist-mill side, when the water was low in the stream, and those wheels were used so as to draw down the water in the pond to about or below the level at which that wheel could draw water.

The plaintiffs' counsel claimed, and argued to the jury, that the plaintiffs were entitled to recover for all the damages which they had sustained by the use of water in excess of the ancient grist-mill right, as defined by the court, whether used by the slate-mill alone, the grist-mill alone, or by both running together.

The defendants' counsel claimed, that upon the evidence, the plaintiffs were not entitled to recover for any such excess of use of water by the grist-mill, when that was running alone. Also, that upon the evidence, the plaintiffs could not recover upon the second count of the declaration ; and requested the court so to rule and instruct the jury.

The defendants further requested the court to rule and charge, that if the jury should find that the paper-mill would not have been injured in its motion, if the plaintiffs had not raised their wheel from the former level, then they could not recover for such injury ; and that, upon the evidence, the plaintiffs, by the employment of their pitch-back wheel, and the taking of the water within

one foot of the top of the dam, had destroyed the gauge and measure of their restrictive right as against the grist-mill privilege, and could not recover by proof, simply, that the use of water by the defendants, injured the paper-mill in its motion from noon to midnight.

Upon inquiry by the court, the defendants' counsel stated that no claim was made that there was any variance between the proof and the second count, and that they made no question on that ground.

The court declined to rule and charge as requested, but upon the questions so raised, and as to these parts of the case, ruled and charged in substance as follows : that the plaintiffs were not entitled to recover for anything done at any time when the pond was kept full of water ; that in low water, that is, when the water of the pond was not running over the dam, the plaintiffs had a right to all the water of the stream, except what belonged to the grist-mill right ; that the grist-mill right was the right to draw as much water as was necessary to operate the grist-mill as it was constructed and accustomed to be used July 30, 1804, as the water was then taken from the dam to run the wheels and runs of stones then in use, from 12 o'clock at night to noon each day, in a continuous flow, and during the remainder of each day, what would be left of the same right, after yielding to the plaintiffs for the use of the paper-mill, as much water as was necessary to operate the paper-mill as that was constructed and accustomed to be used July 30, 1804, as the water was then taken from the dam to run the wheels then in use for that mill, in a continuous flow, in any reasonable manner that would not be worse for the defendants than to take and use the water as it was then taken and used.; that the defendants made no question but that they were liable, and they were to be held liable, for all that was done in running the slate-mill, if any liability was incurred by that ; that they were also to be held liable for all of the running of the grist-mill that they authorized to be done, if any, and no more ; that, if at any time between August 1, 1867, and January 13, 1868, when the pond was not kept full, the defendants took, or authorized to be taken, from the plaintiffs, any of the water of the stream that belongs to

the plaintiffs, and did not belong to the grist-mill right, the plaintiffs were entitled to recover, if not, that the defendants were entitled to recover ; that the defendants were liable for what Reed did, if they authorized it ; that if they gave him to understand that he could do what he did do, with their authority, they were as much liable as Reed would be ; but if they did not authorize it, and Reed went on voluntarily, and they knew nothing about it, then they were not liable for what was done by Reed ; that if the plaintiffs lost anything by using a wheel that was not adapted to the power that he was entitled to, the defendants were not liable for that loss. These several propositions, and their application to the evidence, were explained to the jury.

To the refusal to hold and charge as requested upon the points made by the requests stated, so far as the court did refuse, and to the charge stated upon those points, the defendants excepted. Verdict for the plaintiffs.

*Edgerton & Nicholson* and *Daniel Roberts*, for the defendants.

The plaintiffs claimed to recover, not for a mere technical violation of their right, but for actual and substantial damages, and recovered large damages. This case was confined to such damages as were sustained by the plaintiffs, in the impeding of the motion of the paper-mill wheels by the drawing away from it by the defendants, of the water of the stream to which the paper-mill was entitled during low water, that is, while the water was not flowing over the dam,—and for such damages only, the verdict was given. According to the defendants' evidence, the slate-mill was not running, but the grist-mill was running, during a part of the time in which damages were claimed. The plaintiffs claimed damages for this. It cannot be determined by the verdict, whether these damages were given for an excessive use of the water by the slate-mill alone, by the grist-mill alone, or by both mills when running together. The verdict is consistent with the hypothesis, that whenever the slate-mill was running, either by itself or with the grist-mill, both mills kept within the proper grist-mill right, and that it was only when Reed run the grist-mill by itself, that any damage accrued to the plaintiffs by the impeding of the paper-

mill wheel. It is therefore a material inquiry, whether the defendants were liable for such use of the grist-mill by Reed. The request upon this point, is based upon the claim that there was no evidence tending to prove that the defendants participated in the wrongful act of Reed, either personally, or by direction or pretended authority given him ; and hence it was error to leave this question of authority to the jury. The two leases to Reed, made him the owner of the grist-mill and its privilege for the year, and placed him beyond the control of the defendants in the use of the property. It was not even possible, irrespective of the second lease, to have controlled him in the use of the half which he had acquired from Capen. Taylor L. & Ten. §§ 173, 175, 178. The right which belonged to the grist-mill, was set out upon the public records ; and it cannot be claimed that the defendants leased any greater right than they had.

The charge as given upon this point was misleading and objectionable. The word *authorized*, as used, is equivocal or undefined. If *to authorize*, implies a legal authority, then, *to authorize*, conveys a legal right. But not to stick in this, the judge did not say, *directed*, *licensed*, nor use some like word of specific meaning, as expressing a specific act done. The nearest he comes in affirmative statement towards the definition of this general term, is, " If the defendants *gave Reed to understand* that he could do what he did do, *with their authority*"—which makes it still more indefinite. But when we consider the negative of the statement —"And they knew nothing about it"—it is clearly implied that simple knowledge of what Reed was doing, was *authorizing* him to do as he did. With so loose an instruction, the jury may have believed—for we may well suppose that it was so urged by the plaintiffs' counsel—that the leasing of the mill to Reed, with the changes existing which Howard had made, affording, as claimed, a capacity for an enlarged use of water, itself " authorized" Reed to use the wheels to their full capacity, unless prohibited, and thus to increase the use ; also, that the provision in the contract with Reed in behalf of the slate-mill, conveyed or implied such authority ; also, that the defendants, after the lease, being owners of the property, had a right to control the use, and that their

neglect to do so, "authorized" Reed to do as he did. The court did not instruct the jury otherwise.

As to the defendants' second request in its several branches.

If the rights of the grist-mill are to be determined by the condition of the grist-mill in 1804, it follows that the restriction imposed upon the grist-mill in behalf of the paper-mill, must be gauged by the condition of the paper-mill, its wheels, &c., as they were at the same date. From noon to midnight of each day, the grist-mill of 1804 was not "to take the water from the paper-mill [of 1804] to injure it in its motion." Measuring the limitation of the grist-mill right, with reference to the state of the paper-mill as it was in 1804, the plain question is, was the use of the water by the defendants, such as to have injured the paper-mill in its motion, as the paper-mill was in 1804? There was strong evidence that it was not. Hence, the defendants were entitled to have the first branch of this request answered in the terms of it.

But suppose this question admits of no certain answer, and the jury should say, "We cannot tell." This uncertainty would arise from the fact, that the plaintiffs had made such changes in their mill that no intelligent comparison could be instituted between the old and the new, and between the effects upon each by the grist-mill use — the original gauge and measure of the rightful grist-mill use being destroyed. Then the plaintiffs' case must fail, for it was their act which destroyed the measure, and they cannot throw the hazard of a wrong guess (for it would be but a guess), upon the defendants. The court should have so ruled, as matter of law, as requested.

The mere fact, therefore, that "the use of the water by the defendants did injure the paper-mill in its motion (that is, the present wheel) from noon to midnight," did not warrant a recovery; and this branch of the request should have been answered in the terms of it.

The charge on these points. The court charged in general as to the *quantity* of water to which each mill was entitled—"*As much* water as was necessary to operate the grist-mill;" "*As much* water as was necessary to operate the paper-mill," &c. But the question was not altogether one of quantity, but of adapta-

tion of wheels to receive and use the quantity to which each was entitled. The court did add, by way of sanction to the changes made by the plaintiffs, that the use of that quantity might be had by the plaintiffs, " in any reasonable manner that would not *be worse for the defendants* than to take and use the water as it was then [1804] taken and used." If the defendants were complaining of the mode in which the plaintiffs used the water, it would be pertinent to say, that the plaintiffs were not authorized to make any change to the damage of the defendants. But the defendants are not complaining, nor did the changes made by the plaintiffs, " make it worse for the defendants," but rather the better, to the extent that the plaintiffs disabled themselves from appropriating the water. Clearly, this was no sufficient answer to the specific terms of our request. Again, the court did charge that the defendants were not liable for any loss to the plaintiffs, occasioned " by their using a wheel that was not adapted to the power that they were entitled to." But the plaintiffs' testimony tended to show, that this wheel was adapted to the power, if, as they claimed, they had the first right to the water at all hours of the day, and irrespective of the grist-mill rights ; but that it was a wheel, as set and arranged, which could not be used in certain stages of the water, if the grist-mill was allowed any right of use. This charge does not meet the point of the difficulty, by instructing the jury that, in order to a recovery for an obstruction to the wheel, it must appear that the wheel was so constructed, set, and arranged, that it yielded to the grist-mill all the rights which belonged to it, and yet it was obstructed. Now this right of the grist-mill, was the right to run for twelve hours of the day, although the paper-mill should be thereby injured in its motion—a right to all the water of the stream, to the extent of the grist-mill's capacity as it was in 1804; and the right, for the other twelve hours of the day, so to use the water, up to the point of not injuring the motion of the paper-mill of 1804. This point was not defined, nor was ascertainable by any water-mark indicated on the rocks or the dam, or by any depth of water in the pond, but was a matter of experiment from time to time, by actual use, and not of mensuration. By change of conditions, the plaintiffs

have made the experiment impossible of performance, and destroyed the test of the grist-mill rights. This determinate test was essential to the defendants, that they might at all times use their right up to its full limit, without hazard of exceeding it. The case shows that this test was destroyed by the plaintiffs, and the charge of the court on this point, was no proper answer to the defendants' specific request. Again, the court's charge as to the respective rights of the two mills, as bearing on this point, was positively erroneous. It is not true, that during that half of the day when the paper-mill had the preference, the defendants were bound to yield to the paper-mill "*as much* water as was necessary to operate it" as it was in 1804, if the plaintiffs had disabled themselves from appropriating it; nor, if the changes made, left the defendants in uncertainty whether their use of the water would have injured the paper-mill of 1804 in its motion.

*C. H. Joyce* and *E. J. Phelps*, for the plaintiffs.

This case really presents upon the exceptions no question whatever for the decision of the court. It was very fully considered by this court on a former occasion, and all the rules of law applicable to it, carefully and clearly laid down. 44 Vt. 416. The exceptions brought up, so far as reserved on trial, relate exclusively to the charge of the court. The propositions of the charge will be found to be in exact accordance with the former decision of this court, and to be expressed with remarkable clearness and accuracy. The case shows that four claims, or requests, were made by the defendants to the court, in relation to the charge; and it is only to the omission of the court to comply with those, so far as they did so omit, that exceptions are taken.

1. That plaintiffs were not entitled to recover for any excess of water used by the grist-mill when running alone. As no reason whatever was stated at the trial in support of this proposition, it is, of course, impossible for the plaintiffs now to anticipate on what ground it will be placed, if still insisted on. If reference is had to the tenancy of Reed, the point, if there is any, should have been so explicitly stated, that the court could rule intelligently upon it, and the other side could understand it. But

the facts stated in the case, leave no room for objection to the charge upon this score.

2.   The defendants' next claim is, that no recovery could be had upon the second count.   What hidden snare is supposed to lurk under this proposition, was not disclosed, and is not readily to be seen.   The evidence fully supports the count.   No question of variance is made.   And it is quite immaterial whether a recovery takes place on one count or both.

3.   Defendants' third point was, that plaintiffs' damages were in part owing to the construction of this wheel.   The plaintiffs' evidence was directly to the contrary.   The court charged upon this point, that the plaintiffs' right was, to use the water " in any reasonable manner to operate the paper mill, that would not be worse for the defendants than to take and use the water as it was then [at the date when defendants' title accrued, July 30, 1804,] taken and used."   And that, " if the plaintiffs lost anything by using a wheel that was not adapted to the power that they were entitled to, the defendants were not liable for that loss."   This charge was clearly right.

4.   The defendants' last point is, that the plaintiffs cannot recover, because, by changing their wheel since 1804, they have destroyed the gauge of their right.   This claim is wholly destitute of foundation in fact or in law.   It is not true that the particular form of wheel employed in the paper-mill in 1804, was made by any of the deeds, the measure of the privilege.   If it had been so, the privilege would not have been lost by a change of the wheel.   The use described in a deed, is always construed as a mere measure of the amount of water conveyed, unless a special restriction to that use is inserted.   And the same amount of water may be applied to any use.   The plaintiffs might therefore have pulled down the paper-mill itself, and established any other kind of a mill, run by totally different machinery, so long as they used no more water.   If the law was as the defendants contend on this point, it would destroy their own privilege.   This court has in the former decision, limited their right to the amount of water used by the grist-mill in 1804.   Since then, by many successive changes in channel, flume, wheels, and mills, they have long since

obliterated the particular measure of their right that stood there in 1804, though the means of ascertaining the amount then used on both sides, still remain.

The opinion of the court was delivered by

PIERPOINT, Ch. J. The rights of the parties to this suit to the use of water, and the amount thereof that each might draw for the use of their respective mills and machinery, were settled when this case was before this court at a former time, as reported in 44 Vt. 416. The case now comes up from a trial subsequently had in the county court, where the questions now involved arose upon the plaintiffs' claim for damages that they had sustained in consequence of the violation by the defendants of their rights as so. established, and such questions are based upon the requests made by the defendants, that the court would charge as requested, which the defendants claim the court did not do, and the charge as made upon those requests, to each of which the defendants excepted.

The defendants requested the court to rule and charge, that if the jury should find that the paper-mill would not have been injured in its motion if the plaintiffs had not raised their wheel from the former level, then they could not recover for such injury, and that upon the evidence, the plaintiffs, by the employment of their pitch-back wheel and the taking of the water within one foot of the top of the dam, had destroyed the gauge and measure of their restrictive right, as against the grist-mill privilege, and could not recover by proof, simply, that the use of water by the defendants did injure the paper-mill in its motion from noon to midnight.

The court charged the jury, that the plaintiffs were not entitled to recover for anything done at any time when the pond was kept full of water; that in low water, that is, when the water of the pond was not running over the dam, the plaintiffs had a right to all the water of the stream, except what belonged to the grist-mill right; that the grist-mill right was a right to draw as much water as was necessary to operate the grist-mill as it was constructed and accustomed to be used July 30, 1804, as the water was then taken from the dam to run the wheels and runs of

stones then in use, from 12 o'clock at night to noon each day, in a continuous flow, and during the remainder of each day, what would be left of the same right, after yielding to the plaintiffs for the use of the paper-mill, as much water as was necessary to operate the paper-mill as that was constructed and accustomed to be used July 30, 1804, as the water was then taken from the dam to run the wheels then in use for that mill, in a continuous flow, in any reasonable manner that would not be worse for the defendants than to take and use the water as it was then taken and used ; that if the plaintiff lost anything by using a wheel that was not adapted to the power that he was entitled to, the defendants were not liable for that loss. That the court in this, correctly defined the rights of the parties as established by this court upon the former trial, is not denied. That they were properly applied to the evidence, and explained to the jury by the court, so that no injury would be likely to result from their misapplication by the jury, the case states ; and we think there was a substantial compliance by the county court with all the requests of the defendants that they were entitled to have granted. That part of the defendants' request that is based upon the fact that the plaintiffs had changed their wheels from what they were in 1804, thereby destroying the gauge and measure of their right, we think the party was not entitled to. To hold otherwise, would be, in effect, to restrict the plaintiffs, not only to the quantity of water used in 1804, but to the same manner of using it. The plaintiffs have the right to change their wheels and the manner of using the water, provided they use no more. If they change to their own prejudice, the defendants are not responsible for it, and the court so told the jury. If the change destroys the ready and easy means of determining the quantity of water used in 1804, the defendants do not thereby lose their right, but the parties must establish their rights by such evidence as can now be had ; and they must stand upon the same ground that they would have stood upon, if the wheels and manner of taking the water had been destroyed by time or floods. We think there was no error in the charge or the omission to charge in this respect.

But it is insisted on the part of the defendants, that the court

erred in submitting the question to the jury, as to whether Reed, in his use of the water while he held a lease of the defendants' right, was acting under the authority of the defendants in exceeding the rights which the defendants had. The defendants claim that there was no evidence tending to show that they authorized Reed to use the water as he did. We think the facts and circumstances detailed in the bill of exceptions, had a tendency to show that the defendants authorized Reed to do what he did do ; whether the evidence was sufficient or not, was for the jury. The circumstances under which the business was done between the defendants and Reed ; the fact that the defendants were there upon the ground, knew the manner in which Reed was using the water, making no objection or giving any intimation to Reed that he was using too much water, using the water in connection with Reed to a large extent and under the same right, and all the circumstances taken together,—were sufficient to warrant the court in submitting the question to the jury.

Judgment affirmed.